# Haines et al. *v.* Lone Star Shipbuilding Co. and United States Shipping Board Emergency Fleet Corporation, Garnishee, Appellant.

*Foreign attachment—Garnishment—Emergency fleet corporation—Federal agency—Corporations—State courts—Federal courts —Jurisdiction — Concurrent jurisdiction — Federal Act of Sept. 7, 1916, Comp. Stat., section 8146f—Statutes—Construction.*

1. The Emergency Fleet Corporation, incorporated under the laws of the District of Columbia in pursuance of the authority given to the Shipping Board under the Federal Shipping Act of Sept. 7, 1916, section 11 (U. S. Comp. Stat., section 8146f), to form a corporation for the purpose of carrying out the act, with powers defined to be for the "purchase, construction, equipment, lease, charter, maintenance and operation of merchant vessels in the commerce of the United States," is subject to a writ of foreign attachment issued from a state court, although such corporation is a federal agency, with all of its stock held by the United States, has the right of eminent domain, and the President, under the emergency fund provisions of the Urgent Deficiencies Act, and under other acts, designated the corporation to perform certain duties similar to those embodied in its certificate of incorporation. The work of such a corporation is the work of a business corporation pure and simple.

2. When the government embarks in industrial enterprises through corporate form, it places its money and its sovereign position in the same plane as any other stockholders buying stock in the same corporation.

3. Where the garnishee is a public officer charged with a governmental duty or is in fact a branch of the government exercising governmental function the courts have refused to permit moneys to be attached in their hands.

4. Corporations organized under the laws of the District of Columbia may, in the absence of legislation to the contrary, be sued in the state courts, although the federal courts have concurrent jurisdiction.

Argued March 24, 1920. Appeal, No. 223, Jan. T., 1920, by United States Shipping Board Emergency Fleet Corporation, Garnishee, from order of C. P. No. 5, Phila. Co., June T., 1919, No. 118, discharging rule to quash writ of foreign attachment in case of William H. Haines et al., Trustees, trading together under Deed of Trust dated Jan. 17, 1912, as Haines, Jones & Cadbury Company, v. Lone Star Shipbuilding Company, Defendant, and United States Shipping Board Emergency Fleet Corporation, Garnishee. Before BROWN, C. J., MOSCHZISKER, WALLING, SIMPSON and KEPHART, JJ. Affirmed.

Rule to discharge writ of foreign attachment. Before STAAKE, J.

The opinion of the Supreme Court states the facts.

The court discharged the rule. The United States Shipping Board Emergency Fleet Corporation, garnishee, appealed.

*Error assigned* was action of court discharging rule.

*Wm. Y. C. Anderson,* Assistant Counsel for United States Shipping Board Emergency Fleet Corporation, with him *A. Mitchell Palmer,* Attorney General of the United States, for appellant.—It is clear from the Pennsylvania cases that governmental agencies or subdivisions, such as municipal corporations, counties, and the like, are not subject to attachment. The rule is one of public policy. The work of the government must not be interfered with: Minnick v. McDonald, 1 Pa. C. C. R. 191; Raub v. Seaman, 5 Kulp 398; Granite Co. v. Douglass, 3 Pa. Dist. R. 133.

In other states the same doctrine prevails, especially with reference to agencies of the federal government.

For a century the federal courts have held that the United States cannot be sued without its consent, manifested by an act of Congress, and without such an act, no

proceedings will lie against the United States or its property: U. S. v. Clark, 8 Pet. 436; Beers v. Arkansas, 20 How. 527; Louisiana v. McAdoo, 234 U. S. 627; Van Brocklin v. State of Tennessee, 117 U. S. 159; Covell v. Heyman, 111 U. S. 176.

*Pierce Archer, Jr.,* with him *W. Nelson L. West,* for appellees.—The garnishee is not exempt from suit: Bank of U. S. v. Planters Bank of Georgia, 9 Wheat. 907; Turnpike Co. v. Wallace, 8 Watts 316.

This very question has been brought before the United States District Court for the Eastern District of Pennsylvania in the following actions: Commonwealth Finance Corporation, Assignee, v. Philip Landis, Defendant, Emergency Fleet Corporation, Garnishee, June Sessions, 1919, No. 6326; Kinney v. Fairbanks Steam Shovel Co., Defendant, U. S. Shipping Board Emergency Fleet Corporation, Garnishee, June Sessions, 1919, No. 5328; Judge v. U. S. Shipping Board Emergency Fleet Corporation, Sept. Sessions, 1919, No. 6404; Lawton Lumber Co., a Corporation, v. Emergency Fleet Corporation, June Sessions, 1919, No. 6286 (not yet reported).

The motions in all these cases were to dismiss the actions or to quash and dismiss and while some of the motions were irregular, the presiding judge, DICKINSON, J., considered them in a lengthy opinion, and dismissed all of the motions.

OPINION BY MR. JUSTICE KEPHART, June 26, 1920:

September the 7th, 1916, seven months before the United States entered the war with Germany, the Federal Shipping Act (U. S. Comp. St., secs. 8146, a-r) was passed. It provided for the creation of a shipping board with authority to construct and equip ships, to buy, sell and lease ships for use as naval auxiliaries or army transports, or for other naval or military purposes, and, except as there designated, the board could not operate ships purchased or constructed. The members, officers

and employees of the board were subject to federal control, paid by the United States government. They had large administrative powers and were in effect a public service commission having jurisdiction over water transportation.

By section 11 sec. 8146f the board was given authority in its discretion to form one or more corporations to carry out the purposes of the act, the "purchase, construction, equipment, lease, charter, maintenance, and operation of merchant vessels in the commerce of the United States." Pursuant to this authority, after war was declared, a corporation was formed April 16, 1917, under ch. 18, sub. sec. 4 of the laws of the District of Columbia. It was called the United States Shipping Board Emergency Fleet Corporation, with corporate stock of the value of $50,000,000.

The act specified the interest the United States should hold in the stock of the corporation, how the other stock could be disposed of and the final disposition of stock and assets after the war. Under its certificate of incorporation the Fleet Corporation was empowered to purchase, construct, equip, lease, charter, maintain and operate merchant vessels in the commerce of the United States and, in general, to do and perform every lawful act and thing necessary or expedient to be done or performed for the efficient and profitable conducting of the business. It possessed all the powers, obligations and duties of corporations organized under the laws of the District of Columbia and much inherently belonging to corporations organized in any state.

On June 15, 1917, the Congress passed an Urgent Deficiencies Appropriation Act, which conferred upon the President power to purchase, requisition or take over buildings, and produce and purchase ships or material therefor, ships now constructed, in process of contraction or thereafter constructed, all such ships to be managed, operated and disposed of by the President, or "through such agency or agencies as he shall determine from time to time." On July 11th, the Fleet Corpora-

tion was designated by the President as one of the agencies to carry out the powers in so far as they related to the construction, requisitioning and purchasing of vessels and materials therefor, and the Shipping Board was designated as the operating, managing and disposing agency under the Emergency Shipping Fund provision of the Urgent Deficiencies Appropriation Act. The presidential order continued the power of the Shipping Board in the Fleet Corporation, if the board so desired, or through any other corporation organized by the Fleet Corporation for that purpose.

Several other acts of Congress were passed and further orders were issued by the President collating the powers the Congress had conferred upon him and further designating the Shipping Board and the Fleet Corporation as agents to carry out these powers. Congress, by other legislation, had conferred upon the Fleet Corporation power to provide houses for shipyard employees— the land necessary to be acquired under the right of eminent domain.

The Fleet Corporation, in furtherance of the object of its incorporation, acting through its officers, made a contract with defendant, the Lone Star Shipbuilding Company, to construct eight wooden hulls to be used in the construction of ships. Defendant became indebted to plaintiff for plumbing and the latter sued out this writ of foreign attachment against funds in the hands of the Emergency Fleet Corporation, due to the Shipbuilding Company. On motion of the garnishee, joined in by the attorney general of the United States, the court below was asked to quash the writ for the reasons that the garnishee (a) is an agency of the United States for the purpose of carrying out the purposes of the Shipping Act of 1916 and its several amendments; (b) all the capital stock being held by or on behalf of the United States, the company is in effect the government; (c) under the emergency shipping fund provision of the Act of 1917, which provided an appropriation for military and naval

expenses on account of the war, it exercises all the powers of the President; (d) in all its acts it represented the government of the United States, and its contract with the Shipbuilding Company was a contract by that company with the United States government; and (e) the Fleet Corporation has no assets of any kind, except those provided by the government of the United States.

In answering these questions and generally in determining whether the Fleet Corporation is immune from liability because it is alleged to be an arm of the government and, therefore, not subject to the process of the court, and, if not an arm of the government, at least an agency of it, it is well to consider not only the specific acts performed, but the purpose of creating this company and the place it was to fill in the general scheme of promoting the war then at hand, and find therefrom, and from the several acts under which the garnishee was created and designated as an instrumentality for a given purpose, whether it was clothed with powers or attributes different from, or greater than, other corporations.

We may assume, for the purposes of this case, the shipping act, as well as subsequent legislation, had for its immediate purpose the preparation of the United States government for its successful entry into and conclusion of the war with Germany. Broad powers were given to the officers therein named to the end that the country might be put upon a satisfactory war basis, and, in conferring these powers, it is evident Congress had in mind the different branches of government as such—or the administrative boards they created—should be in a position to effectively carry out the objects and purposes proposed. They were immune from civil process, and free from any hampering impediments, such as lack of congressional action. That body had determined nothing should stand in the way of success, barring, of course, any incapacity of those who filled the several offices. But because of certain limitary rules of the department

on the efficiency and effectiveness of the officers and agents of the government in the capacities as indicated, in making and executing contracts and producing results quickly desired, and in order to have an elastic quick moving piece of machinery, appealing to the public's sense of business credit, and for other reasons, Congress authorized the shipping board, if in their judgment they deemed it necessary, to create a corporation which functioned as a great industrial business plant, having its disabilities as well as its desirabilities, save only as the shipping act limited them. To guarantee the integrity of its investment as well as the success of the plan, the United States was to be a stockholder in this company to the extent of not less than 51 per cent of its stock, with the privilege to our citizens of acquiring the other 49 per cent. The United States took it all. While Congress deemed it expedient to thus authorize the formation of such corporation, the expenditure of money of the United States in the capital stock thereof, and subsequent advancement of large sums of money to continue ship construction, there is no provision in any act of Congress which in any way repealed, modified or changed the laws governing this company, inherent in all corporations so created by force of the fact that it is chartered under the laws of the District of Columbia. To all intents and purposes, it operated and existed as any corporation operates and exists,—could sue and be sued, as any corporation might sue and be sued. To what extent has this attribute been destroyed or suspended because of the Shipping Act and sundry other acts of Congress? It must be remembered there is here attached a sum of money,—admittedly, for the purpose of this motion, in the hands of the Fleet Corporation,—due defendant; that is, a proceeding in rem directed against moneys due the defendant owed by the Fleet Corporation. The writ does not attach money uncontracted for, or unspent; that was, by the Emergency Shipping Fund provision of the act, advanced to the garnishee and ear-marked until

expended as funds of the United States government. True, its stock is all owned by the United States government. That is not material. When the government wishes to embark in industrial enterprises, it has been held that it places its money and its sovereign position in the same plane as any other stockholder buying stock in the same corporation: Bank of U. S. v. Planters' Bank of Georgia, 9 Wheaton 904, 907; Turnpike Co. v. Wallace, 8 Watts 316, 318; Seymour v. Milford & Chillicothe Turnpike Co., 10 Ohio 476, 483.

That the corporation was possessed of the right of eminent domain to acquire land for houses, does not take it beyond the station occupied by similar corporations possessing like power, and which are not governmental agencies, or the government. Nor does the fact that the President designated this corporation as the instrumentality through which could be effectively worked out those objects and purposes entrusted to him by various acts of Congress, of itself clothe the corporation as a government representative with immunity from suit, and place the funds due to this defaulting defendant beyond the reach of civil process. The Shipping Act provided for the formation of a corporation, with other minor provisions relative thereto, to carry out the purposes of the act. There is not a single line before us which has a tendency to show that the board conferred on the Fleet Corporation any of its many administrative or governmental duties, but when we turn to the articles of association of this company we find the limit of this "carrying out the purposes of the act" to be the "purchase, construction, equipment, lease, charter, maintenance, and operation of merchant vessels in the commerce of the United States, and in general to do and to perform every lawful act and thing necessary or expedient to be done or performed for the efficient and profitable conducting of said business"; that the President, under the Emergency Fund provision of the Urgent Deficiencies Act, designated this corporation to per-

form certain duties similar to those embodied in its certificate of incorporation, does not alter the real status of this concern, to wit: that it was an arm of the shipping board, functioning as a great industrial business corporation, with power to enact by-laws, vote its stock, deposit its money and securities, and declare dividends from the surplus and profits. The things to be done delegated to it by the President—and we have none other before us—were to construct, requisition and purchase ships, and these powers were clearly in line with the original thought under which this company was incorporated and the purposes expressed by Congress when the Shipping Act was passed and incorporated in the company's charter. It was the work of a business corporation, pure and simple. Nor can we agree that the same immunity that surrounded the President was retained by the corporation when he delegated to it the several duties enumerated. As stated by Judge HAND, in reviewing the Lake Monroe, 250 U. S. 246, "by a precise parity of the reasoning, which the Supreme Court adopted in 'The Lake Monroe,' supra, it must follow that in choosing the Fleet Corporation he [the President] chose it with all its limitations upon its head. In other words, Congress contemplated that possibility, and excepted that, in so delegating his powers, he must subject their exercise to the scrutiny and determination of the customary tribunals, precisely as the Fleet Corporation's other activities were subject......Moreover, it is in general highly desirable that in entering upon industrial and commercial ventures, the governmental agencies used should, whenever it can fairly be drawn from the statutes, be subject to the same liabilities and to the same tribunals as other persons or corporations similarly employed": Gould Coupler Co. v. United States Shipping Board Emergency Fleet Corporation, 261 Fed. 716. True, it may be called an agent of the government and a highly important agent. But it was like many other industrial agents that carry on a great

work without having attached any immunity from the delegating or employing power. With the paramount purpose in view—to wit, the acquisition of vessels for the prosecution of the war—it is difficult to understand in the Lake Monroe case why the vessel there arrested for a tort should not have been immediately released notwithstanding the fact that she was engaged during the war in private coastwise trading at the time the accident occurred; but the Supreme Court of the United States held it liable notwithstanding the paramount purpose and the claim of immunity on the ground that the delegated authority came from an act of the President.

The authorities cited by the appellant, where courts, because of public policy, have refused to permit moneys to be attached, were all cases where the garnishee was a public officer charged with a governmental duty, or was in fact a branch of the government exercising governmental functions as such; but no case has been pointed out where industrial business concerns incorporated for profit, having no attribute of government, have been held to be, under circumstances similar to these before us, government agents free from attachment, or against which claims were not justifiable. Such corporations do not share in civil government as municipal, or quasi municipal, bodies. See Bailey v. Mayor, 3 Hill (N. Y.) 531, 539; Dartmouth College v. Woodward, 4 Wheaton 518. They possess no legislative power, no executive control, so far as the body politic is concerned, nor do they exercise judicial functions as to acts between citizens. It is a business corporation, to be treated as such, unless Congress expressly provides otherwise, which has not been done in the present instance. It would seem that the Congress, by its several acts, intended the general course of the law, with respect to the litigation with which this company might be connected, should be applicable. To evidence this purpose it provided an exception to the general rule by requiring that suits brought to recover compensation for property requisitioned

should be instituted as prescribed by the judicial code; section 24, paragraph 20, and section 145 are mentioned as covering the cases. It is a fair inference that its other legal difficulties were to be litigated in the usual tribunals.

If it was the intent of the Congress that the Fleet Corporation should be immune from civil process, it would have been very easy to have written it into the act; but nowhere is such language found, nor can it be reasonably inferred therefrom. If the Fleet Corporation was to be immune from civil process of any nature whatever, why the necessity of a Fleet Corporation at all? The United States government, acting through the shipping board as such, was immune from such process. It possessed the power and authority to do all the corporation could do. What was the intent of the Congress when it authorized the creation of the Fleet Corporation if it was not for the purpose of conducting a business corporation and assuring to those with whom it dealt that they would have a speedy adjustment of all claims. If not so adjusted, they had a debtor responsible in a court of law for the contracts and obligations undertaken, and when its contractors incurred debts a way was at hand, as in this case, to compel payment. Where would this immunity cease, considering the language of the delegation and the sundry subsequent delegation of the same subject-matter as the corporation was empowered to and did make?

It must be further borne in mind that at this time the enforcement of the present attachment does not interfere with the construction of ships, nor does it endanger the public welfare in the slightest degree, nor is it capable of doing any act that would jeopardize the interests of the government. Courts will not close their doors to the relief of honest claimants (who have dealt with concerns such as herein discussed) for the reason that at one time they were engaged in and had for their immediate purpose the preparation of the United States government

for its successful entry into and conclusion of the war with Germany.

We might then safely rest the case on the general rule that it, as a corporation doing business in Pennsylvania, is amenable to the processes of this court. As a corporation, chartered in the District of Columbia, there is no doubt the federal courts have concurrent jurisdiction with the state courts, it being a creature of the United States government. It has been held that corporations organized under the laws of the District of Columbia may be sued in the state courts: Sheffer v. Natl. Insurance Co., 25 Minn. 534. Generally speaking, whenever the legal right arises and the state court is competent to administer justice, the right may be asserted in such court although the federal court may have concurrent jurisdiction, unless the jurisdiction is limited by law to the federal courts. State courts have, therefore, been held to have jurisdiction of the suit against a federal officer or an officer of the general government, except where exclusive jurisdiction is given to the federal courts: Scranton v. Wheeler, 179 U. S. 141, affirming Scranton v. Wheeler, 113 Mich. 565; Crawford v. Waterson, 5 Fla. 472, 474; Smith v. Berman, 8 Ga. A. 262, 273; Ward v. Henry, 19 Wis. 76, 80; Teall v. Felton, 1 N. Y. 537, 543; Polack v. Mansfield, 44 Cal. 36, 40; Lewis v. Buck, 7 Minn. 104, 112. In Kneedler v. Lane, 45 Pa. 238, 249, Judge LOWRIE has an interesting discussion as to the right of the state courts to exercise jurisdiction over questions emanating from federal laws, but no question is here raised as to the right to sue in the state court because the garnishee is a corporation of the District of Columbia. We conclude, therefore, that the attachment was proper and a valid process against the garnishee.

The order of the court below is affirmed.