Nippon Ki-Ito Kaisha, Ltd., Appellant, *v.* Ewing-Thomas Corporation.

Argued November 29, 1933.   Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Edwin A. Lucas,* with him *Charles J. Biddle,* of *Drinker, Biddle & Reath,* for appellant.

*Wm. Barclay Lex,* with him *Hepburn & Norris* and *Matthew Rankin,* for appellee.

OPINION BY MR. JUSTICE SIMPSON, January 2, 1934:

Plaintiff, a Japanese corporation having an office in the City of New York, by three several written contracts, agreed to sell to defendant, a corporation of this Commonwealth with its principal office in our City of Chester, and the latter agreed to buy one hundred bales of raw silk, of the character and at the prices specified therein. Each of the contracts provided that "All of the terms and provisions of the raw silk rules of the Silk Association of America, Inc., approved and adopted by its board of managers, December 10, 1924, and all subsequent amendments thereto, not inconsistent herewith, are incorporated as a part of this contract"; and each agreement further specified that "Every dispute, of whatever character, arising out of this contract, must be settled by arbitration in New York, to be conducted in the manner provided by the by-laws, rules and regulations of the Silk Association of America, Inc., governing arbitrations."

Plaintiff delivered all the silk provided for in said contracts, but defendant paid less than one-half the contract price, alleging, as its reason for refusing to pay the balance, that the silk was of a quality inferior to that contracted for. Plaintiff denied this, and proposed to defendant that the dispute between them should be "settled by arbitration in New York, to be conducted in the manner provided in the by-laws, rules and regulations of the Silk Association of America, Inc., governing arbitrators," as the several contracts between the par-

ties stipulated "must" be the course pursued under such circumstances. To this defendant refused to agree, whereupon plaintiff filed a petition, as provided by section 3 of our Arbitration Act of April 25, 1927, P. L. 381, setting forth the facts and praying an order on defendant to show cause why this dispute "should not be submitted to arbitration in the manner provided for in said contracts." This section of the statute provides: "The party aggrieved by the alleged failure, neglect or refusal of another to perform under a written agreement for arbitration, may petition the court of common pleas of the county having jurisdiction for an order to show cause why such arbitration should not proceed in the manner provided for in such agreement."

Defendant, instead of making answer to this petition, filed a counter petition asking the court to "preliminarily determine certain questions of jurisdiction in this case, in accordance with the provisions of the Act of Assembly of March 5, 1925, P. L. 23." Seven such questions were stated therein but they raise only a single point, viz.: "Whether our [Arbitration] Act of April 25, 1927, P. L. 381, is applicable to a proceeding to compel the parties to arbitrate their disputes in a foreign jurisdiction," here in New York. Upon this petition, also, a rule to show cause was granted, and, after argument, the court below filed an opinion and made the following order: "And now, to wit, June 1, 1933, it is ordered and decreed that the petition of the defendant raising questions of jurisdiction be and the same is hereby sustained, and it is further ordered and decreed that the plaintiff's petition be and the same is hereby refused." From this order plaintiff appealed. It must be reversed.

Although the same reasons are given by the court below for both parts of its order, a distinct and separate reason exists for reversing the first part, viz., the Act of 1925 does not apply to the existing situation. We have several times said, and the statute clearly shows, that it

applies only in cases where the court below has no jurisdiction over the parties or over the subject-matter of the particular litigation: Skelton v. Lower Merion Twp., 298 Pa. 471; Gray v. Camac, 304 Pa. 74. Here, both plaintiff and defendant appeared generally before the court, and hence it had jurisdiction over them. It also had jurisdiction to decide whether or not defendant can be required to proceed to arbitration in New York, for section 3 of the Arbitration Act expressly gives it such jurisdiction. That it may ultimately decide it has no power to so require, does not deprive it of jurisdiction to decide the question; rather it affirms the jurisdiction.

Apparently this matter was not brought to the attention of the court below, possibly because all the points raised by defendant's counter petition were applicable to the questions raised by plaintiff's petition requiring defendant to show cause why it should not submit the dispute to arbitration. This being so, we will treat the facts averred in defendant's petition as an answer to that of plaintiff, and determine the appeal accordingly.

One of the points strenuously argued by defendant, though not referred to in the opinion of the court below, is that even if we should hold the language of our statute was broad enough to compel defendant to go to New York to arbitrate the disputes which had arisen, we should not so construe it, because, under like circumstances, the courts of that state would not compel her citizens to come into Pennsylvania to arbitrate their disputes. It is difficult to see upon what principle we could so decide, even if the courts of New York had so held, since it is our duty to determine all legal questions raised in accordance with the law as we understand it, no matter what the courts of other states may do, unless, indeed, the question raised is as to what is the law of such other state.

The law of New York is not correctly stated by defendant, however. At one time, prior to the passage of their Arbitration Act (which is in all substantial re-

spects and much of it in the same language as ours), it was there held as defendant contends, but the reverse is true since the passage of that statute. The Court of Appeals, in Gilbert v. Burnstine, 255 N. Y. 348,—the latest case on the subject,—by an unanimous vote so decided. In that case, defendants were "citizens and residents" of New York. By a clause of the contract there in litigation, the parties agreed that all differences arising thereunder should be "arbitrated at London pursuant to the Arbitration Law of Great Britain." Such differences did arise and plaintiff "served notice upon defendants at New York requesting them to concur in the nomination of a certain named individual or of some other resident of London as sole arbitrator. The notice also stated that in the event of defendants' failure to concur in the nomination of an arbitrator, plaintiff would apply to the High Court of Justice of England for such an appointment, pursuant to the provisions of its Arbitration Act of 1889 (52 and 53 Vict, ch. 49). On defendants' failure to comply with the notice, plaintiff obtained from the Court of King's Bench Division an order permitting him to issue a form of process which is described in the complaint as an originating summons. This process was served upon defendants at New York and it directed them to appear at a certain time and place in London before a master in chambers so that an arbitrator might be appointed. Defendants again failed to comply, and thereupon the master appointed an arbitrator. He issued a notice which was served upon defendants in New York requiring them to furnish him at a specified time and place in London with all documents relevant to the matters in dispute. This notice, like the others, was ignored by defendants. The arbitrator, after causing a peremptory notice to be served upon them, also in New York, proceeded with the arbitration at London, and made an award of £46,000 against them." Upon that award suit was brought in New York, the Supreme Court and its appellate division successively deciding

that the award had no validity. The court of appeals reversed, saying (page 353) : "Settlements of disputes by arbitration are no longer deemed contrary to public policy. Indeed, our statute encourages them. Contracts directed to that end are now declared valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract...... Their contract constitutes something more than a simple executory one subject to breach. Not only under the foreign statute but also under our own arbitration law, it has become irrevocable in the sense that one of the parties without the consent of the other cannot deprive it of its enforcibility...... In order, therefore, to determine the issue asserted by defendants that jurisdiction never was acquired, the question must be decided whether their agreement to submit to that jurisdiction is contrary to our public policy. Generally, extraterritorial jurisdiction of alien tribunals, however vigorously asserted, is denied by us. Of its own force, process issued from the court of a foreign state against our citizen and served upon him here, is void. Without his consent he cannot be made subject to it, but whenever he agrees to be bound by its services, his conduct presents a [different] problem. Contracts made by mature men, who are not wards of the court should, in the absence of potent objections, be enforced. Pretexts to evade them should not be sought. Few arguments can exist based on reason or justice or common morality which can be invoked for the interference with the compulsory performance of agreements which have been freely made. Courts should endeavor to keep the law at a grade at least as high as the standard of ordinary ethics. Unless individuals run foul of constitutions, statutes, decisions or the rules of public morality, why should they not be allowed to contract as they please? Our government is not so paternalistic as to prevent them. Unless their stipulations have a tendency to entangle national or state affairs, their contracts in advance to submit to the

process of foreign tribunals partake of their strictly private business. Our courts are not interested except to the extent of preserving the right to prevent repudiation."

With this statement of the law we are in entire accord, though we are not required to go so far in the present case. That decision is based upon the doctrine of inviolability of contracts which has been a cardinal principle in the constitutional law of both the nation and the state ever since they have existed as such. As the years go by, and we are brought face to face with many ingenious attempts to evade or qualify it, we are increasingly convinced of the necessity for holding fast to this ancient landmark of our constitutional existence. This is a complete answer to every argument now made to sustain the order of the court below. It might be well, however, to refer, as briefly as we may, to some of those arguments, lest it be thought we have not given due consideration to them.

The principal contention made in the opinion of the court below, is that our Arbitration Act relates only to arbitrations to be held in Pennsylvania. The statute does not say so, and the argument brought forward to show that under sections 6, 10 and 11 that conclusion must be implied, is not only both labored and inconclusive, but also wholly overlooks other sections of the act. Moreover it ignores the legal principle that it is our duty to sustain the act, if this can reasonably be done, and not to destroy it either in whole or in part.

The court below calls attention to the fact that section 6 says that if witnesses summoned by the arbitrators "refuse......to obey said summons, upon petition, the court of common pleas of the county in which such arbitrators are sitting" may compel them to appear and testify. It does so say, but therefrom there is no justification for the conclusion of the court below "that this clearly indicates that the legislature intended that the act should only apply to situations where the arbitra-

tors were sitting in Pennsylvania." If the arbitrators were sitting in New York and the witnesses were in Pennsylvania, that provision could be applied, but it could not be applied to cases where the witnesses were not in Pennsylvania, no matter where the arbitrators were sitting. Consequently, it might more accurately be inferred "that this [section of the statute] clearly indicates that the legislature intended that the act should only apply to situations where "all the important witnesses in the cause are to be found in Pennsylvania." No one suggests this, however. What the provision under consideration does mean is, that in the case of recalcitrant witnesses, the court of common pleas of the county where the arbitrators are sitting cannot escape acting because the suit is pending in some other county. By this section of the act the former court is given additional jurisdiction under the circumstances stated.

As to sections 10 and 11 the court below says: "Furthermore, sections 10 and 11 indicate that the court should have jurisdiction over the arbitrators themselves [as indeed it does in the many instances provided for in the act]. Section 10 provides that 'where an award is vacated......the court may, in its discretion, direct a rehearing by the arbitrators.' Should this situation later arise, and we should direct a rehearing, we would have no means of enforcing such an order. The legislature certainly never intended that the court should issue a useless order, and it further indicates that the act refers only to cases where the arbitration is proceeding within the State of Pennsylvania. The same reasoning applies to section 11 which provides that 'the court may modify and correct the award or resubmit the matter to the arbitrators.' "

If we assume that all these difficulties are possibilities, defendant is not helped. It was bound to know the law, and yet, notwithstanding that, agreed, for a valuable consideration, to the arbitration out of which these difficulties are conjured. Suppose, as here, the jurisdic-

tional county was Delaware, and the arbitrators chose to sit in Erie, nearly all of the difficulties suggested would exist, exactly as if they were sitting in New York, and in many respects the annoyances would be greater. It has not infrequently occurred, under earlier statutes, that arbitrators have refused to sit, or have disappeared before their first report was completed, or could not be found when the court vacated that report, yet, so far as we are aware, no one ever suggested that those acts were unenforceable. Indeed, all such objections, properly appraised, relate to the entire system of arbitration, which by section 1 of our Arbitration Act is approved as part of the public policy of this Commonwealth. If the statute does not cover every possible situation which may arise,—and this is the basis of these objections,—doubtless the court below and the counsel in the case, especially under the authority contained in other sections of the act, will readily find a way to surmount such difficulties. The proceeding in the court below is, in effect, a bill for specific performance of the arbitration provisions of the contracts (Red Cross Line v. Atlantic Fruit Co., 264 U. S. 109, 124), and the scope of the chancellor's power in that character of case is probably broad enough to overcome all such difficulties.

Section 5 of the act provides that "The respective courts of common pleas shall have the power to make and adopt rules concerning procedure and practice under this act, as shall seem to them proper, except that no rule shall make any provision contrary to the *express* provisions of this act." Section 7 says: "Upon petition, approved by the arbitrators, the court may direct the taking of depositions on behalf of any party, to be used in evidence before the arbitrators, in accordance with existing law with respect to depositions." And section 9 and the later sections appear to cover every point which may arise after the filing of the arbitral award, and give to the court complete control thereover. Without much difficulty these several sections of the statute could prob-

ably be utilized to overcome every fearsome doubt, now seemingly harassing appellee and the court below, but if not the remedy is for the legislature and not for the courts.

As in New York, so here, it was at one time held that "The general jurisdiction of the several courts of the Commonwealth is established by law, not only for the security of private rights, but, by securing these for the promotion of the good order and peace of society. It is against public policy, therefore, that parties should, by the terms of a private agreement, in advance oust their jurisdiction": Rea's App., 13 W. N. C. 546. But that reasoning, and hence the conclusion drawn from it, has no applicability at this time. The same legislative power, by which "the general jurisdiction of the several courts of the Commonwealth is established by law," now, by our Arbitration Act, has declared that, except in actions for personal services, that "general jurisdiction" may be ousted by arbitral provisions such as the ones we are now considering. Hence the "general jurisdiction" referred to, cannot establish a public policy against the arbitration sought for, which, on the contrary, it now establishes. In section 1 of the statute it is expressly declared that under a provision in any written contract, except a contract for personal services, "agreements to settle by arbitration a controversy thereafter arising out of such contract, or out of the refusal to perform the whole or any part thereof......shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." The legislature has thus expressed the public policy of the Commonwealth to enforce,—save in the inapplicable instances therein expressed,—provisions for arbitration. When, then, plaintiff showed to the court below that the contracts in suit contained a valid provision for arbitration, as binding as any other provision in the contract, and defendant did not allege anything which denied its free execution of the contract, and pointed to no taint in

it, but simply denied the right of the court below to enforce it, although defendant had received and was retaining the consideration given for it, the court below should have said to defendant that the constitutional public policy of the nation and the state alike require us to enforce such contracts, and not to aid in defeating them either in whole or in part, especially where, as here, the only antagonistic reasons given are based solely on imaginary fears and not upon facts. Defendant was not compelled to enter into a contract with that provision in it, but, having done so and having received the benefit thereby arising, must stand to that which it voluntarily agreed to do. To hold otherwise would be against the principles of elementary justice, and so the court below should have decided in this case. As it did not do so, we will.

The order of the court below is reversed, defendant's petition is dismissed, and the record is remitted that an order may be forthwith entered in accordance with the prayer of plaintiff's petition, the litigation thereafter to proceed to final judgment and recovery thereon sec. leg.