Central Contracting Company, Appellant, *v.* C. E. Youngdahl & Company, Inc.

Argued October 13, 1964. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Bresci R. P. Leonard,* with him *Royston, Robb, Leonard, Edgecombe & Miller,* for appellant.

*John A. Metz, Jr.,* with him *Harry Rubin,* and *Rubin & Balter,* and *Metz, Cook, Hanna & Kelly,* for Crump, Incorporated, appellee.

OPINION BY MR. JUSTICE COHEN, May 3, 1965:

This is an appeal by plaintiff, in an assumpsit action, from an order of the lower court en banc sustain-

ing preliminary objections to foreign attachment[1] and to jurisdiction; the latter objection was apparently based upon certain arbitration clauses set forth in the contract.

In 1960, plaintiff-appellant, Central Contracting Company (Central) entered into an agreement with a party contracting under the name of "C. E. Youngdahl & Company, Inc.—Crump, Incorporated—Psaty & Fuhrman, Inc., A Joint Venture." The joint venture had a general contract with the Pittsburgh Housing Authority. Central agreed with the joint venture to do certain painting work generated by the general contract. Central brought suit against the joint venture, alleging that "defendants required plaintiff to perform extra and additional painting services" for which Central sought compensation, and against the Housing Authority as garnishee.

While the lower court did not dismiss the complaint or enter judgment against the plaintiff or order arbitration, its order so restricted Central's further action "as, virtually, to put . . . [it] out of court on the cause of action which . . . [it] seeks to litigate," *Sullivan v. Philadelphia*, 378 Pa. 648, 649, 107 A. 2d 854, 855 (1954), and, therefore, the order below is appealable.

The lower court held that property in the hands of a Housing Authority, organized pursuant to the Housing Authorities Law of 1937, Act of May 28, 1937, P. L. 955, 35 P.S. §1541, is, ipso facto, immune from an otherwise appropriate foreign attachment because the Authority could not be summoned as garnishee. This was error.

Appellee argues that as a "general rule . . . the United States, the states and their political subdivi-

---

[1] Pa. R.C.P. 1271 provides: "The defense of immunity or exemption of property from attachment and the defense that no prop-

sions and agencies . . . cannot be summoned as garnishees in any action, without statutory authorization or consent or waiver." 6 Am. Jur. 2d, Attachment and Garnishment §78, p. 615. See also 17 McQuillin, Municipal Corporations, §49.86 (1950 ed.). Pennsylvania courts have applied this so-called general rule to prohibit attachment of property in the hands of the Pennsylvania Turnpike Commission, *Iron City Spring Co. v. Teer*, 53 Dauph. 118 (1942), the Urban Redevelopment Authority of Pittsburgh and the Public Parking Authority of Pittsburgh, *Richter v. George Doherty Lumber Co.*, 16 Pa. D. & C. 2d 181 (1958), and the City of Pittsburgh, *Wood Refrigerating Co. v. Preston*, 7 Pa. D. & C. 2d 648 (1956). The most recent case in which this Court discussed this rule was *Haines v. Lone Star Shipbuilding Co.*, 268 Pa. 92, 110 Atl. 788 (1920). In *Haines* we did not apply the rule for reasons discussed below.

Appellee further contends that, because §10 of the Housing Authorities Law provides that "[a]n authority shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof . . .,"[2] and because, in certain other contexts, we have recognized its public or governmental nature,[3] we should determine that, under the so-called general rule, it cannot be summoned as garnishee in foreign attachment proceedings. Granting, for present purposes only, that the Housing Authority is engaging in governmental projects on behalf of the Com-

---

erty of the defendant was in the possession of the garnishee at the time of service of the attachment, may be raised by the defendant without thereby subjecting himself to the jurisdiction of the court "(1) by preliminary objection under Rule 1017(b)(1). . . ."

[2] Act of May 28, 1937, P. L. 955, §10, 35 P.S. §1550.

[3] See *Dornan v. Philadelphia Housing Authority*, 331 Pa. 209, 200 Atl. 834 (1938) and *Mitchell v. Chester Housing Authority*, 389 Pa. 314, 132 A. 2d 873 (1957).

monwealth, nevertheless, we cannot agree with appellee's position.

It is apparent that the rationale behind the so-called general rule, as stated first in *Bulkley v. Eckert,* 3 Pa. 368 (1846) has little force in the instant circumstances. "Great public inconvenience would ensue, if money could be thus arrested in the hands of officers, and they be made liable to all delay, embarrassment, and trouble that would ensue, from being stopped in the routine of their business compelled to appear in court, employ counsel, and answer interrogatories, as well as take care that the proceedings are regularly carried on, and bail to return duly given."[4]

The activities carried on by the Housing Authority implicate it in various and complex legal relationships involving bonds, construction contracts, and leases. This is why "[a]ny Authority may employ its own counsel and legal staff."[5] In this context it is plain that the duties of a garnishee in foreign attachment proceedings are not overly burdensome upon an Authority.[6] Indeed, rather than "being stopped in the routine of their business," *Bulkley,* supra, this type of

---

[4] In *Bulkley* we held that money in the hands of a school board treasurer, owing to a teacher, could not be attached by the teacher's judgment creditor.

[5] Act of May 28, 1937, P. L. 955, §7, 35 P.S. §1547.

[6] Generally speaking, if a garnishee forwards the papers served upon him to the defendant and files a report concerning the property of defendant in his hands, there is little else he is required to do. He need not object to the attachment or defend the action or check that the procedure is proper and may at any time before judgment contend that the property involved is immune or exempt from attachment or that there was no property of the defendant in his hands at the time of attachment, notwithstanding any contrary admissions he may have made in the report or interrogatories. Pa. R.C.P. 1266, 1268, 1275, 1276, 2 Goodrich-Amram, §§1266(a)-1, 1266(a)-3, 1268(a), 1268(b), 1275(b)(3), 1275(b)(4), 1276(c)-1.

everyday legal work *is* routine business for the Authority.

Moreover, notwithstanding their public and nonprofit nature, Housing Authorities engage in activities that have the aspect of large scale, private commercial enterprises and, in the course of these activities, deal extensively with the private commercial world. In part, similar considerations moved us in *Haines v. Lone Star Shipbuilding Co.,* supra, to hold that the Emergency Fleet Corporation could be summoned as garnishee in foreign attachment proceedings, although we recognized that it might be called "an agent of the [federal] government and a highly important agent," formed by the United States Shipping Board for "the preparation of the United States Government for its successful entry into and conclusion of the war with Germany." We found that since Congress had chosen to allow the Shipping Board to work through a corporation, formed like a regular business corporation, it should have "its disabilities as well as its desirabilities, save only as the shipping act limited them." While the Housing Authority is not formed like a regular corporation we cannot rightly say our *Haines* decision was bottomed on such a limited ground, in view of our favorable citation therein of Judge LEARNED HAND'S statement: " 'Moreover, it is . . . highly desirable that in entering upon industrial and commercial ventures, the governmental agencies used should, whenever it can fairly be drawn from the statutes, be subject to the same liabilities and to the same tribunals as other persons or corporations similarly employed.' " *Haines,* supra, at p. 100.

Turning to the Housing Authorities Law, it provides that the Authority may "sue and be sued". Act of May 28, 1937, P. L. 955, §10(t), 35 P.S. §1550(t). We see no reason why these words should be narrowed by implication to exclude an ordinary legal process in-

cident to suit. In *Rader v. Pennsylvania Turnpike Commission*, 407 Pa. 609, 182 A. 2d 199 (1962), the matter was quite different. There we held that, in view of the fact that roadbuilding was a traditional and, by statute, "essential governmental function," the Legislature would not be deemed to have waived the Commonwealth's immunity from tort liability in respondeat superior in the absence of express provisions to that effect, even though the Commission could "sue and be sued." Amenability to garnishment process incident to foreign attachment proceedings is not analogous to tort liability in respondeat superior.

For similar reasons, the Supreme Court of the United States held that the Federal Housing Administration was subject to state garnishment proceedings. *Federal Housing Administration v. Burr*, 309 U.S. 242 (1940) : "[W]hen Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to 'sue and be sued,' it cannot be lightly assumed that restrictions on that authority are to be implied. Rather if the general authority to 'sue and be sued' is to be delimited by implied exceptions, it must be clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense. In the absence of such showing, it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue and be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." p. 245

Finally, there can be no doubt that the Authority would be amenable to suit on its agreement with the general contractor. In this light, it would be difficult to support a conclusion that it is not amenable to garnishment process at the instance of a subcontractor—creditor, whose rights, if any, arise out of work on the project contracted for by the Authority.

Although the lower court erred in deciding that the Housing Authority was not amenable to garnishment process in a foreign attachment action, we cannot decide, on the present record, whether or not the attachment ultimately should be upheld. The general contractor was comprised of a domestic corporation and two foreign ones. The group dealt with Central as a joint venture, as evidenced by such designation in its contract with Central. Thus, it was proper for Central to bring its suit on the contract against the joint venture as the party-defendant. And, presumably, its attachment was directed against assets belonging to the joint venture but in the hands of the Housing Authority. While the Pennsylvania Rules of Civil Procedure do not set forth how a plaintiff should serve a joint venture or when its assets are subject to foreign attachment, we are of the opinion that the corresponding Rules regulating partnerships are applicable, until the Rules expressly provide otherwise.

Regarding foreign attachment, the pertinent part of Pa. R.C.P. 1252 provides: "A foreign attachment may be issued to attach property of a defendant . . . when . . . (2) the defendant is a partnership . . . without a regular place of business in the Commonwealth and the action is against the defendant in its firm . . . name, even though one or more members of the partnership . . . are present in or are residents of the Commonwealth. . . . ." Applying this Rule to a joint venture it appears that its assets are not subject to foreign attachment when it has a regular place of business in

the Commonwealth. What constitutes a regular place of business must be decided first by the trial judge in view of all the surrounding circumstances. Of course, the decision must be made in the context of the activities of a joint venture, the scope of which, by definition, is more limited than that of a partnership. Depending upon the circumstances, a regular place of business for the joint venture might be at the regular place of business of one of the participants in the joint venture or at a location apart from that of any of the participants or both. If the lower court finds that the joint venture has a regular place of business in the Commonwealth it must dissolve the attachment.

However, if the joint venture does have a regular place of business in the Commonwealth then service of process upon it may be had in accordance with Pa. R.C.P. 2131 which regulates service upon a partnership with a regular place of business in the Commonwealth.

In this case, Central's complaint was served upon Crump, Incorporated, a domestic corporation and one of the participants in the joint venture, at its principal place of business in Pittsburgh. If Crump's principal place of business was also a regular place of business of the joint venture then the foreign attachment should be dissolved but jurisdiction over the joint venture has been obtained by service of the complaint on the joint venture. If Crump's principal place of business is not a regular place of business of the joint venture and there is no regular place of business in the Commonwealth, then the foreign attachment of the joint venture's assets was proper and jurisdiction over Central's dispute with the joint venture has been obtained. Only if Crump's principal place of business is not a regular place of business for the joint venture and there is a regular place of business for the joint venture in the Commonwealth has the lower court

failed to obtain jurisdiction over the joint venture by personal service on it or Central's dispute with the joint venture by foreign attachment. However, since jurisdiction has probably attached by one or the other method we shall proceed with the next problem which would, in that event, confront the lower court.

Appellee asserts that the following clause of the joint venture's contract with Central prohibits Central from bringing this suit: "The Subcontractor [Central] agrees that it will not commence any action, whether in law or in equity, against the Contractor [joint venture] or its sureties on bonds, if any, because of any matter whatsoever arising out of the alleged breach or performance of this subcontract agreement, in any Courts other than those in the County of New York, State of New York. . . ."[7]

Only twice have Pennsylvania's Appellate Courts decided upon the legal effect of this type of provision. In *Rea's Appeal,* 13 W.N.C. 546 (1883), suit was instituted in Allegheny County against a trustee, who asserted that the trust instrument directed that such suit be brought only in Butler County. The court refused to give effect to the asserted provision, holding that, "when in a proper case the parties are served, and brought before a competent tribunal," it would be contrary to public policy to allow an agreement made in advance of the dispute to oust said tribunal's "jurisdiction." In *Healy v. Eastern Building and Loan Association,* 17 Pa. Superior Ct. 385 (1901), following *Rea's Appeal,* supra, it was held that plaintiff's agreement, made in advance of the dispute, to sue defendant only in Onondaga County, New York, could not deprive Pennsylvania courts of their "jurisdiction" over the cause.

---

[7] The labor and materialmen's bond provides that suit upon it shall be brought in the state where the work was performed but Central's suit is not on this bond.

In our opinion, these cases are correct to the extent that they hold that private parties cannot change by contract the rules of jurisdiction or venue embodied in the various laws of this Commonwealth. Jurisdiction over the party or the subject matter or venue of the cause is not a thing to be determined by private bargaining. However, we do not agree with these cases to the extent that they hold that an agreement between the parties, purporting to determine the forum where future disputes between them should be litigated, is per se invalid and without legal effect. The modern and correct rule is that, while private parties may not by contract prevent a court from asserting its jurisdiction or change the rules of venue, nevertheless, a court in which venue is proper and which has jurisdiction should decline to proceed with the cause when the parties have freely agreed that litigation shall be conducted in another forum and where such agreement is not unreasonable at the time of litigation. See Restatement, Contracts §558; L. HAND, J., concurring in *Krenger v. Pennsylvania R. Co.*, 174 F. 2d 556, 560-561 (2d Cir. 1949); *Wm. H. Muller & Co., Inc. v. Swedish American Line Ltd.*, 224 F. 2d 806 (2d Cir. 1955); *Cerro De Pasco Copper Corp. v. Knut Knutsen*, O.A.S., per FRANK, J., 187 F. 2d 990 (2d Cir. 1951); *Euzzino v. The London & Edinburgh Insurance Company Ltd.*, 228 F. Supp. 431 (N.D. Ill. 1964); *Takemura & Company v. The S.S. Tsuneshima Maru*, 197 F. Supp. 909 (S.D. N.Y. 1961). Such an agreement is unreasonable only where its enforcement would, under all circumstances existing at the time of litigation, seriously impair plaintiff's ability to pursue his cause of action. Mere inconvenience or additional expense is not the test of unreasonableness since it may be assumed that the plaintiff received under the contract consideration for these things. If the agreed upon forum is available to plaintiff and said forum can do substantial jus-

tice to the cause of action then plaintiff should be bound by his agreement. Moreover, the party seeking to obviate the agreement has the burden of proving its unreasonableness.

The procedure used to raise and decide the issue of forum non conveniens should also be used by the lower court to decide whether it should decline to exercise its jurisdiction in support of the agreement between the parties. Of course, the question is not strictly one of jurisdiction and, therefore, the lower court's decision on the matter would be interlocutory and unappealable unless it were decided adversely to plaintiff and the complaint were dismissed.

If the lower court decides that it has jurisdiction over the joint venture or Central's dispute with the joint venture, and if it decides further that it must exercise its jurisdiction because the agreement to litigate only in New York is unreasonable, it will then be confronted with the question of what impact the arbitration provisions of the contract should have upon Central's suit. For present purposes, the pertinent parts of the arbitration provisions provide: "33(b). If the Subcontractor [Central] is contending that the work in question is not included in this subcontract . . . the matter shall be determined by negotiation between the parties involved and, if the said parties cannot agree, the matter shall be determined by arbitration pursuant to Paragraphs 54, 55 and 56 below. . . .

. . . .

"54. All disputes . . . which may arise out of this agreement shall be submitted to arbitration as hereinafter provided. . . .

"55. All arbitration proceedings shall be held within the City of New York, and shall be subject only to the jurisdiction of the Supreme Court of the State of New York, and the Appellate Courts of said State, whether it be with respect to the initiation of said ar-

bitration proceedings, their conduct, or any proceeding in connection therewith, including the award of the arbitrators. . . ."

The defendant raised these arbitration provisions both by way of preliminary objection to the lower court's jurisdiction and by way of application for a stay of proceedings until arbitration is had in accordance with the agreement, under the Act of April 25, 1927, P. L. 381, §2, as amended, 5 P.S. §162. Central asserted in subsequent pleading that defendant could not invoke the arbitration clauses because it had failed to "negotiate" the dispute in accordance with Paragraph 33(b). The lower court simply purported to sustain defendant's preliminary objection without discussion, except to note that arbitration was a condition precedent to litigation.

"It is clear that an arbitration provision in a contract—irrespective of whether it is common law or statutory arbitration—does not affect the jurisdiction of the lower Court . . ." over the subject matter of the controversy or the parties. *University Square No. 1, Inc. v. Marhoefer,* 407 Pa. 257, 259-260, 180 A. 2d 427, 429 (1962). But how the lower court should give effect to the arbitration clause of the contract is a separate matter, upon which, in our opinion, the lower court has not yet passed.[8] In light of the unusual provisions regarding jurisdiction over the arbitration the question is not free from difficulty. Compare *Nippon Ki-Ito Kaisha, Ltd. v. Ewing-Thomas Corporation,* 313 Pa. 442, 170 Atl. 286 (1934), where the Arbitration Act of 1927 was applied, with *Lowengrub v. Meislin,* 376 Pa. 463, 103 A. 2d 405 (1954), where the Act of 1927 was not applied but instead common law arbitra-

---

[8] Defendant asserts that the lower court stayed proceedings pending arbitration under the Act of 1927 but we find nothing in its opinion or order supporting such assertion.

tion principles were held applicable. See also 93 A.L.R. 1073. Because the lower court has not reached and may find it unnecessary to reach this question and because it has not been fully argued or briefed we do not find it appropriate to discuss it here. However, we note in passing that we find no merit in Central's contention that defendant may not even invoke the arbitration clauses because of its failure to "negotiate" the dispute. In our opinion, Paragraph 33(b) does not make negotiation a precondition to arbitration. A contrary conclusion would ascribe to the parties an irrational intention to prevent arbitration when they most need it, i.e., when they are at such odds that they cannot even negotiate about their differences. The language does not command such a result and, in view of its irrationality, we will not so interpret it. Moreover, we have no way of determining what the parties intended by the word "negotiation" and, therefore, could not enforce it.

Order vacated and case remanded for proceedings consistent with this opinion.