**LCI COMMUNICATIONS, INC., and Litel Telecommunications Corporation, Plaintiffs,**

v.

**Matthew G. WILSON, Defendant.**

**Civ. A. No. 88–2327.**

United States District Court, W.D. Pennsylvania.

Dec. 8, 1988.

---

Arthur Schwab, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiffs.

James D. Morton, Buchanan, Ingersoll, P.C., Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

COHILL, Chief Judge.

Presently before us is plaintiffs' Motion for Preliminary Injunction and defendant's Motion for Summary Judgment. On November 9, 1988, we conducted a hearing on plaintiffs' motion and consolidated the trial on the merits with the hearing pursuant to Federal Rule of Civil Procedure 65(a)(2). For the reasons provided below, we will grant plaintiffs' motion, deny defendant's motion, and enter judgment for the plaintiffs. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, we make the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

The plaintiffs, LCI Communications, Inc. ("LCI") and LiTel Telecommunications Corporation ("LiTel"), brought this action to enjoin the defendant, Matthew G. Wilson, from violating the provisions of an employment contract that he signed at the commencement of his employment with LiTel.

LCI is a corporation organized under the laws of Delaware with its principal place of business in Ohio. LiTel is a wholly-owned subsidiary of LCI, and is also organized under the laws of Delaware with its principal place of business in Ohio. The defendant, Matthew G. Wilson, is an Allegheny County resident and a citizen of Pennsylvania. The amount in controversy, exclusive of interest and costs, exceeds $10,000.

LCI, through its wholly-owned subsidiary, LiTel, is in the business of operating a common carrier telecommunications service. LCI has no sales force and conducts its operations solely through LiTel. LiTel operates its network in the midwest region of the United States, including Western Pennsylvania, and does not compete with other telecommunication companies on a nationwide level.

LiTel employs account executives to sell its products and services. The account executives' customer contacts are frequent and regular; this is the primary means by which the corporation develops good will. LiTel invests substantial amounts of money and time in programs and training to ensure that its account executives are properly trained and informed regarding LiTel's products and services.

As a result of LiTel's training methods, the account executives establish a permanent and exclusive relationship with the customers they service. LiTel compiles and distributes customer lists and information to the account executives in order to assist them in sales. This information is highly confidential and constitutes a valuable asset of LiTel.

LiTel utilizes various devices to protect its customer lists and files from disclosure to non-employees. LiTel restricts access to customer lists, marks certain documents "confidential," and instructs the account executives during the training seminars and staff meetings that all customer information is confidential. In addition, at the commencement of employment, each account executive signs a five page employment contract which consists of a letter agreement and a noncompetition agreement.

The letter agreement outlines the position, duties, compensation and benefits of a LiTel account executive. In addition, it states, "As a condition of employment you will agree to sign and abide by the terms of the attached Competition/Confidentiality Statement."

The noncompetition agreement, attached to the letter agreement, is captioned "LCI

Communications, Inc.," and it provides in relevant part:

As a condition of my employment or continued employment (whichever is applicable) by LCI Communications, Inc., a Delaware corporation (the "Company"), and of the salary or other compensation to be paid to me during the term of such employment, I hereby agree as follows:

1. *Confidential Information*

I will not, while in the employment of the Company or at any time thereafter, disclose to any person or entity or use for the benefit of myself or any other entity any Confidential Information (as hereinafter defined) that may be communicated to, acquired by or learned of by me in the course of or as a result of my employment with the Company. I further agree that all records, files, memoranda, reports, business plans, customer lists and other property relating to the Business of the Company (as hereinafter defined) which I will use, prepare or come into contact with will be and remain the sole property of the Company, will be returned by me to the Company upon the termination of my employment and will not be copied or used by me except to the extent required in the course of my employment by the Company.

3. *Interfere with Relationships with Employees, Suppliers and Customers*

During the term of my employment by the Company and for a period of one (1) year following the termination of such employment, I will not, directly or indirectly, disturb, hire, entice or in any other manner persuade or induce or attempt to persuade or induce any employee, customer principal or supplier of the Company to discontinue his or its relationship with the Company.

4. *Agreement Not to Compete*

During the term of my employment with the Company and for a period of one (1) year following the termination of such employment, I will not, for myself or on behalf of any other person or entity, directly or indirectly compete with the Business of the Company with respect to any customer of the Compa-

ny or in any county in which the Company is conducting its business. The foregoing restriction on competition will preclude, without limitation,

A. my selling or soliciting sales of products and services which compete with the Business of the Company, and

B. my accepting employment with or acting as a representative or agent of or a consultant to a customer of the Company or any other person of entity which competes with the Business or the Company if as a result thereof, I would be engaged in activities which compete with the Business of the Company.

9. This Agreement shall be construed under the laws of the State of Ohio.

On April 1, 1986, LiTel hired defendant Matthew Wilson as an account executive in the Pittsburgh office. At that time, Mr. Wilson signed both the letter and noncompetition agreements. Previously, Mr. Wilson worked for LiTel as an independent contractor "sales representative." This was Mr. Wilson's first experience in telecommunications marketing.

LiTel assigned Mr. Wilson the sales territory consisting of the Pennsylvania counties in the 412 area code ("412 sales territory"). The Court has taken judicial notice that the counties in the 412 sales territory consist of: Allegheny; Armstrong; Beaver; Butler; Fayette; Greene; Indiana; Lawrence; Mercer; Washington; and Westmoreland. As an account executive, Mr. Wilson solicited new customers and continuously monitored their needs for additional products and services.

During his employment, the defendant received confidential information from the plaintiff. For example, Mr. Wilson developed close personal contacts with the customers he serviced and obtained an awareness of their particular needs and requirements. Furthermore, he received from plaintiff product literature and advice in training seminars and weekly staff meetings about how to approach sales and improve sales techniques. Finally, Mr. Wilson had access to customer lists and files

which detailed LiTel's actual and prospective customers in the 412 sales territory. This confidential information was customer-specific and included the name of the customer's decision maker, the likelihood of a sale, the existing products and services of the customer, the cost of existing products and services, the status of potential sales, and the products and services in which the customer might be interested.

The defendant was responsible for over 30% of the total sales in the Pittsburgh office, making him one of the most successful LiTel account executives.

In late August, Mr. Wilson interviewed with MCI Telecommunications, Inc., ("MCI"). MCI is a nationwide provider of telecommunications services and is a competitor of LiTel. On September 8, 1988, Mr. Wilson submitted his resignation to LiTel and shortly thereafter began working for MCI. Before he left LiTel, Mr. Wilson secretly copied customer lists and files. In addition, he retained most of the product literature, training materials and personal files that he had accumulated while an employee of LiTel. Mr. Wilson took all of this confidential information with him to MCI and kept it in his desk at MCI where he freely allowed MCI's employees to use it.

LiTel asked Mr. Wilson to return all of its documents when he went to work for MCI. However, the defendant lied and stated that he did not retain any of LiTel's confidential information. When later questioned about his possible retention of LiTel information, the defendant again emphatically denied that he had any such information. In fact, LiTel only learned of Mr. Wilson's secretive copying and the extent of his possession of LiTel documents through the discovery process associated with this lawsuit.

As an employee of MCI, Mr. Wilson has made sales or attempted sales to his former LiTel customers. In fact, the defendant's daily log at MCI revealed that 45% of the contacts he made on behalf of MCI were to LiTel customers or prospective customers that he had learned of through his work with LiTel. The evidence demonstrates that LiTel has lost at least 3 customers to Mr. Wilson and MCI, and that other MCI account executives have contacted LiTel customers based on information that they received from Mr. Wilson. In addition, Mr. Wilson has provided MCI's Director of Customer Service with the price list of LiTel's products and services.

The plaintiffs contend that these acts violate the provisions of Mr. Wilson's employment contract relating to noncompetition and confidential information. In addition, they allege that Mr. Wilson has violated his common law fiduciary duties by misappropriating and disclosing confidential information and trade secrets.

The defendant now admits that he copied LiTel customer files and lists and that he solicited his former LiTel customers. He contests his liability by arguing that the employment contract was with LCI, not LiTel, and is unenforceable because it lacks consideration and is unreasonable.

A restrictive covenant is not essential to create liability in this situation because appropriation of a former employer's customer list and files is of itself a violation of the fiduciary obligation inherent in the employer/employee relationship. Nevertheless, we believe that the employment contract in question here is valid and enforceable, and thus we need not reach the question of defendant's liability under tort law.

## II. CONCLUSIONS OF LAW

Because we consolidated the hearing on plaintiffs' motion for a preliminary injunction with the trial on the merits pursuant to Rule 65(a)(2), we have cast our findings in terms of the legal standard applicable to a permanent injunction, rather than a preliminary injunction. *See Ciba–Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*, 747 F.2d 844, 847 (3d Cir.1984). In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits. If so, the court must then consider the appropriate remedy and its scope. *See Evans v. Buchanan*, 555 F.2d 373, 380 (3d Cir.1977).

## A. SUCCESS ON THE MERITS

### 1. *Definition of the Contract*

The first issue that we must resolve is whether the employment letter agreement and the noncompetition agreement constitute one or two contracts. The defendant argues that the documents are two separate contracts because the parties differ; the employment letter agreement is a contract between LiTel and the defendant, and the noncompetition agreement is a contract between LCI and the defendant. Specifically, the defendant contends that his signing the noncompetition agreement was conditioned on his working for LCI. According to the defendant, he never worked for LCI. Rather, his employer was LiTel. Thus, there was no consideration for the agreement, and it is unenforceable. The defendant argues that the only means of enforcing the noncompetition agreement is to pierce the corporate veil and find that LCI and LiTel are really one. However, argues defendant, piercing the corporate veil would be inappropriate, because LCI and LiTel maintain total corporate separateness.

■■■ Although paragraph 9 of the noncompetition agreement provides that it shall be construed under Ohio law, Pennsylvania law must govern the scope of the contract before paragraph 9 can come into play. Choice of law rules of the forum state are applied in diversity actions to determine which state's law governs a claim. *Klaxon Co. v. Stentor Elec. Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under the flexible contacts/interests analysis adopted in Pennsylvania in *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), the substantive law of Pennsylvania would govern the resolution of this controversy. The defendant is a Pennsylvania resident, the contract was executed in Pennsylvania and the contract was allegedly breached in Pennsylvania. *See, Bonham v. Dresser Industries, Inc.*, 424 F.Supp. 891, 899 n. 35 (W.D.Pa.1976) (holding that the enforceability of a contract of employment is governed by the law of the place where the last act necessary for its formation has taken place).

■■■ Under Pennsylvania law, it is a general rule that when two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole. *Von Lange v. Morrison–Knudsen Co., Inc.*, 460 F.Supp. 643, 647 (M.D.Pa.1978). This rule applies even though the parties to the separate writings may not be the same as long as the writings pertain to the same transaction and interpretation is aided by reading them together. *Von Lange, supra*, at 648; *See* 4 S. Williston, Contracts, 628 (3d ed.1961). Here, the letter agreement and the noncompetition agreement were signed by the defendant on the same day and both relate to his contract of employment. Furthermore, the letter agreement between LiTel and Mr. Wilson referred to and was expressly contingent upon the execution of the noncompetition agreement. We believe that it was the intent of the parties that the letter agreement and noncompetition agreement constituted one employment contract between LiTel and Matthew Wilson.

The United States District Court for the Middle District of Pennsylvania was confronted with a similar problem of contract interpretation in *Von Lange*. There, the plaintiff was majority shareholder and president of Intma, Inc. Intma and the defendant, Morrison–Knudsen Co., entered into a partnership agreement to sell bonded rail joints. Simultaneously, the plaintiff and his son entered into a sales representative agreement with the defendant in which the plaintiffs agreed to market the rail joints for the partnership. The partnership agreement specifically referred to the sales representative agreement and was made contingent upon the the execution of the sales representative agreement. *Von Lange, supra*, at 645–47.

Although the partnership agreement provided a method and date for termination, the sales representative agreement did not provide under what circumstances the plaintiffs' services could be terminated. Subsequently, the defendant withdrew

from the partnership, but never specifically terminated the sales representative agreement. Another corporation purchased the partnership, and the plaintiffs continued to solicit orders for the rail joints so that the purchaser would have a backlog of orders when it took over. *Id.* at 645–46.

Thereafter, the plaintiffs sued the defendant for commissions due under the sales representative agreement. The defendant argued that the two agreements constituted one contract and that termination of the partnership agreement automatically terminated the sales representative agreement. The plaintiffs contended that the agreements were separate contracts because the parties to the agreement were different. *Id.* at 647.

Although acknowledging that the parties to the two agreements were nominally not the same, the court held that, "We find it unnecessary to pierce the corporate veil in order to arrive at the conclusion that the parties are identical as it is clear that the two agreements are interrelated and that only by interpreting the two together can the true intent of the parties be understood." *Id.* at 648. Consequently, the court decided that termination provision of the partnership agreement applied to the sales representative agreement. *Id.*

We too believe that it is unnecessary to pierce the corporate veil in order to arrive at the conclusion that the restrictive convenants in the noncompetition agreement applied to Mr. Wilson's employment at LiTel. Only by construing the two documents together can we ascertain the true intent of the parties. Both agreements were executed at the same time and both related to the same subject matter. Moreover, the letter agreement expressly referred to and was made contingent upon the execution of the noncompetition agreement. The defendant testified that he was aware of the corporate structure of LiTel when he signed the agreements. Furthermore, if we were to interpret the noncompetition agreement as between Mr. Wilson and LCI, it would render the agreement meaningless, because LCI does not operate a telecommunications network and does not

employ a sales staff. Consequently, we find that the letter agreement and the noncompetition agreement constitute one employment contract between Mr. Wilson and LiTel, and that it was the intent of the parties that the provisions in the noncompetition agreement applied to Mr. Wilson's employment with LiTel. We will hereinafter refer to the two documents collectively as the "employment contract."

### 2. *Validity of the Restrictive Covenants*

■ Having determined the binding effect of the employment contract, we now turn to the issue of its validity. The initial inquiry with respect to the employment contract is the choice of law to govern the action. As a federal court sitting in Pennsylvania, we must look to the law of Pennsylvania for the choice of law. *Klaxon, supra,* 313 U.S. at 487, 61 S.Ct. at 1020. The employment contract specifies that the law of the State of Ohio will govern the interpretation of the contract. Pennsylvania courts honor choice of law provisions in contracts, provided that the choice of the forum does not seriously impair the plaintiff's ability to pursue his cause of action. *Central Contracting Co. v. C.E. Youngdahl & Co.,* 418 Pa. 122, 133, 209 A.2d 810, 816 (1965). We cannot find any compelling reason for denying the parties their contractual choice of law, and the defendant does not object to the application of Ohio law. Therefore, we will apply Ohio law to the contractual claims in this action.

■ Under Ohio law, restrictive covenants are valid and enforceable if they are: (1) ancillary to an employment agreement; and (2) reasonable. *Briggs v. Butler,* 140 Ohio St. 499, 45 N.E.2d 757, 761 (1942). We find the first element of validity met, as the LiTel restrictive covenants were included in, and were an integral part of, the employment contract.

■ The second prerequisite to enforceability of restrictive covenants under Ohio law is that the covenants must be reasonable. *Briggs, supra,* 140 Ohio St. at 504, 45 N.E.2d 757. Restrictive covenants restraining an employee from competing with

his former employer upon termination are reasonable if they are: (1) limited in duration and scope; (2) necessary for the protection of the employer; (3) not unreasonably restrictive upon the rights of the employee; and (4) not injurious to the public. *Barnes Group, Inc. v. O'Brien,* 591 F.Supp. 454, 460 (N.D.Ind.1984) (applying Ohio law).

■ We find that the restrictive covenants in the LiTel employment contract are reasonable. The defendant does not contend that the one year time restriction is unreasonable, and under Ohio law a one year time limit on competition is clearly reasonable. *Premix, Inc. v. Zappitelli,* 561 F.Supp. 269, 275 (N.D.Ohio 1983) (two years); *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544, 547 (1975) (three years). However, the defendant does argue that the geographic area proscribed by the employment contract is overbroad and unreasonable because it precludes him from doing business in any county where LiTel conducts business.

■ Many Ohio courts have upheld geographical restrictions that are broader in scope than the restriction involved in this case. *See Nordson Corp. v. Plasschaert,* 674 F.2d 1371, 1377 (11th Cir.1982) (applying Ohio law, court expanded geographic area to include the United States, Canada, and Western Europe); *Patterson International Corp. v. Herrin,* 25 Ohio Misc. 79, 264 N.E.2d 361, 363–64 (1970) (holding that agreement preventing former employee from competing in 45 states was reasonable). In addition, Ohio law permits a district court to amend or modify an employment agreement to achieve a fair and equitable solution. *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 24, 325 N.E.2d 544, 547 (1975). The geographical limitation of "any county" in this contract is inherently divisible, and we believe that an Ohio court would limit the restriction to a reasonable geographical boundary according to the realities of the situation.

Here, the plaintiff only seeks to enforce the geographical restriction in the contract to the counties in the 412 sales territory. Because Wilson only solicited and was privy to customer information in these counties, we believe that restraining competition in these counties is all that is reasonably necessary for the plaintiff's protection. Accordingly, the geographical restriction is reasonable in scope.

Clearly, the restrictive covenants are necessary to protect LiTel's proprietary interest in its customers, customer goodwill, and other confidential information. Testimony by Mary M. Southworth, Vice President Administrator of LiTel, revealed that LiTel's sole mode of contact with its customers is through its account executives. Furthermore, she testified that when an account executive leaves LiTel and abides by the employment contract, LiTel retains 100% of its business with that account executive's customers. However, if a LiTel account executive breaches the contract, LiTel's business is seriously eroded as demonstrated in this case by its loss of 3 customers to MCI. Ohio courts have generally upheld restrictive covenants as necessary to protect an employer's business, especially when that business is built on customer goodwill and when it relies on its account executives as its sole mode of customer contact. *Briggs, supra,* 140 Ohio St. at 509, 45 N.E.2d 757. Accordingly, the restrictive covenants are necessary to protect LiTel's proprietary interests.

In addition, the restraints will not deprive the defendant from earning a living in areas with which he is familiar. The covenants, as enforced, will only bar the defendant from soliciting in the 412 sales territory for one year. During that time, he can solicit customers outside the 412 sales territory. Furthermore, MCI is a national company with the ability to move the defendant to another region. After one year, Mr. Wilson can contact any customers that he chooses. Moreover, the defendant testified that he could be successful selling MCI products in an area other than his former sales territory, and that the inability to call his former LiTel customers would not impede his ability to earn a good salary and commissions. Thus, we find that the covenants do not unduly restrict

the employment opportunities of the defendant.

Finally, it is not argued, and no evidence exists, to support a finding that the restrictive covenants are injurious to the public.

Consequently, we find the restrictive covenants to be reasonable in all respects, and thus valid and enforceable.

### 3. *Breach of the Contract*

The defendant admitted that he violated numerous provisions of the employment contract. First, the defendant promised not to work for a competitor, for one year following the termination of his employment with LiTel; shortly after his voluntary resignation from LiTel, he did go to work for MCI, LiTel's competitor. Second, the defendant promised not to interfere with LiTel's customers. However, not only has he contacted his former customers, but he has furnished his MCI coworkers with stolen customer information which has enabled them to successfully solicit LiTel's customers.

Finally, the defendant promised not to use or disclose any of LiTel's confidential information, including customer, product and price information. He also promised to return all trade secrets and confidential information to LiTel upon termination of his employment. The defendant not only failed to return this information, he secretly copied entire customer files and lists and took them with him to MCI, where he shared them with his coworkers.

We find that the defendant has unlawfully used LiTel's confidential customer, product and price information in order to solicit LiTel customers to switch to MCI in violation of his employment contract. In addition, he has disclosed and made use of confidential information which he had obtained while employed by LiTel. Accordingly, it is an inescapable conclusion that defendant breached his employment contract with LiTel.

The plaintiffs have proven that the employment contract is reasonable and valid. It is no greater than necessary to protect the employer's legitimate interests, and it does not pose an undue hardship on the defendant. In addition, plaintiffs have established that the defendant has breached the contract. Accordingly, we find that the plaintiffs have succeeded on the merits of their contract claims. Our next step is to consider the appropriate remedy.

### III. RELIEF

In order for a permanent injunction to issue, the plaintiffs must satisfy three requirements. First, they must show that the court's exercise of equity jurisdiction is proper. Second, they must succeed on the merits of their claims. Third, they must demonstrate that the balance of the equities tips in favor of injunctive relief. *Northeast Women's Center, Inc., v. McMonagle*, 665 F.Supp. 1147, 1152–53 (E.D.Pa. 1987).

### A. EQUITY JURISDICTION

■ Under the first requirement for a permanent injunction, the plaintiffs must demonstrate that their request constitutes a proper exercise of the court's equitable jurisdiction. Equity jurisdiction is proper if (1) the plaintiff has no adequate legal remedy, (2) the threatened injury is real, not imagined, and (3) no equitable defenses preclude jurisdiction. 11 C. Wright & A. Miller, *Federal Practice and Procedure*, 2942–44 (1973).

■ The main prerequisite to obtaining a permanent injunction is a finding that plaintiff will suffer some injury for which he has no adequate remedy. What constitutes an adequate remedy depends on the facts of each case. However, if a legal remedy would be as effective as an injunction in providing the claimant with relief, there is no need for the court to invoke its equity jurisdiction. *11 C. Wright & A. Miller, supra*, at 2944.

■ Here, the legal remedy is inadequate to compensate for the harm caused by defendant's unlawful competition. The defendant has breached the employment contract by soliciting LiTel's customers and by using misappropriated confidential information to gain a competitive advantage over LiTel. The corporation has already

lost 3 customers, and the defendant has contacted numerous others. In this industry, once customers are lost, they often remain lost. Moreover, once trade secrets and confidential information are divulged, they are no longer secret and confidential. The defendant has taken a permanent bite out of LiTel's customer goodwill, and this damage could never be calculated in monetary terms, nor could continued solicitation of LiTel customers in the 412 sales territory be prohibited in any way except by injunction. Accordingly, the plaintiffs have no adequate legal remedy.

When an injunction is sought to enjoin a threatened injury, the injury feared must be a presently existing actual threat. As the facts above reveal, the defendant's conduct demonstrates that there exists a present, actual threat of unlawful dissemination of confidential information and solicitation of LiTel's customers in the 412 sales territory. Thus, the plaintiffs fear of future injury is real and not imagined.

An exercise of equitable jurisdiction that is otherwise proper may still be precluded by a valid equitable defense. Here, the defendant does not assert any such defenses. Accordingly, the Court's exercise of equity jurisdiction in this case is proper.

## B. SUCCESS ON THE MERITS

As discussed above, the plaintiffs have actually succeeded on the merits of their contract claims. The defendant breached the valid anticompetitive clause of the employment contract by working for a competitor—MCI. Likewise, he violated the noninterference clause of the contract by actually soliciting his former LiTel customers. Finally, the defendant breached the confidential information provision of the contract by stealing customer files and other memoranda and using them while at MCI to gain a competitive edge.

## C. BALANCE OF EQUITIES

We believe that the balance of equities favors granting plaintiffs an injunction enjoining the defendant from violating the provisions of his employment contract. The defendant's conduct in this case is so

egregious that it shocks the conscience of this Court. In addition, he testified that he would have no trouble selling MCI's products in another region. LiTel has expended considerable sums of money and time in creating goodwill and in maintaining an extensive and continuous training program for its employees. The courts have long recognized that an employer has an interest in protecting his goodwill and that reasonable restrictive covenants are a valid means of protecting that interest. Accordingly, we will grant the injunction.

## D. SCOPE OF THE INJUNCTION

The court has wide discretion in fashioning a permanent injunction. *Consumer Party v. Davis*, 778 F.2d 140, 146 (3d Cir. 1985). However, an injunction may be no broader than necessary to restrain the unlawful conduct. *Educational Testing Serv. v. Katzman*, 793 F.2d 533, 545 (3d Cir.1986).

The plaintiffs seek an injunction enjoining the defendant from competing with LiTel "with respect to any of the customers he serviced for LiTel or about whom he learned from his employment with LiTel in any county where he formerly represented LiTel," which is the 412 sales territory. In addition, they seek to enjoin him from soliciting any prospective LiTel customers that he learned about while working at LiTel. The practical effect of this is to prevent the defendant from soliciting any customers in the 412 sales territory.

We believe that this injunction would remedy the specific harms shown and is no more intrusive than necessary in order to be effective. The evidence reveals that a one year injunction is necessary for LiTel to re-establish its relationship with the customers that the former account executive serviced. Furthermore, the defendant stole customer files and currently has access to confidential LiTel customer information. In addition, he has had access to documents which list all of LiTel's actual and potential customers in the 412 sales territory. In light of these egregious acts, we believe that the most effective way to enforce the restrictive covenants in the em-

ployment contract is to enjoin the defendant from competing with LiTel in the 412 sales territory for one year from the date of this Order. We realize that this means that it will be about fifteen months from the time Mr. Wilson left LiTel on September 8, 1988, to the time when the injunction will expire on December 7, 1989; the noncompetitive agreement, of course, is only for one year. However, Mr. Wilson benefitted by breaching that agreement following September 8; therefore the injunction should apply for one full year from the date of its issue.

The plaintiffs have also requested monetary relief. During the hearing on the preliminary injunction, we received no evidence on the issue of money damages. The plaintiffs may file an affidavit setting forth any money damages on or before December 20, 1988. The defendant may respond on or before January 3, 1989. Should the Court feel a hearing on damages is necessary, one will be scheduled.

An appropriate Order will issue.

### ORDER

AND NOW, to wit, this 8th day of December, 1988, it is ORDERED, ADJUDGED and DECREED that;

1) The plaintiffs' Motion for an Injunction be and hereby is GRANTED.

2) The defendant's Motion for Summary Judgment be and hereby is DENIED.

3) The defendant is hereby enjoined, for a period of 1 year from the date of this ORDER, from selling or soliciting the sale of products and services that compete with the business of the plaintiffs, in the following Pennsylvania counties which constitute the 412 sales territory as defined in the attached opinion: Allegheny; Armstrong; Beaver; Butler; Fayette; Greene; Indiana; Lawrence; Mercer; Washington; and Westmoreland.

4) The defendant is hereby enjoined, for a period of 1 year from the date of this ORDER, from directly or indirectly disturbing, hiring, enticing or in any other manner persuading or inducing or attempting to persuade or induce any employee of the plaintiffs to discontinue relationships with the plaintiffs.

5) The defendant is hereby enjoined from disclosing or using any of the plaintiffs' confidential information and trade secrets obtained by him while employed by the plaintiff LiTel.

6) The defendant is hereby ordered to return to the plaintiffs all property of the plaintiffs including but not limited to, records, files, memoranda, reports, business plans, customer lists and personal files.

7) The plaintiffs may file an affidavit setting forth alleged money damages on or before December 20, 1988. The defendant may respond thereto on or before January 3, 1989. A hearing on the issue of damages will be conducted should the Court feel one is necessary.